UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| HUMAN LIFE OF WASHINGTON, INC., | Case No. C08-0590-JCC |
| Plaintiff, | |
| v. | ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |
| CHAIR BILL BRUMSICKLE, VICE CHAIR KEN SCHELLBERG, SECRETARY DAVE SEABROOK, JANE NOLAND, AND JIM CLEMENTS, in their official capacities as officers and members of the Washington State Public Disclosure Commission, ROB MCKENNA, in his official capacity as Washington Attorney General, and DAN SATTERBERG, in his official capacity as King County Prosecuting Attorney, | |
| Defendants. | |

This matter comes before the Court on Plaintiff's Motion for Summary Judgment (Dkt. Nos. 66, 67), the State Defendants' Response (Dkt. No. 70), and Plaintiff's Reply (Dkt. No. 78). Having considered the parties' briefing and supporting documentation, the Court has determined that oral argument is unnecessary and hereby finds and rules as follows.

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 1

# I.    BACKGROUND

## A.    Washington State Disclosure Requirements

In 1972, Washington voters passed Initiative Measure No. 276, which established the state's Public Disclosure Commission ("PDC") and laid the framework for Washington's campaign finance laws. Washington Revised Code § 42.17.010 states the public policy behind the statutory framework, including:

> (1) That political campaign . . . contributions and expenditures be fully disclosed to the public and that secrecy is to be avoided.
>
> . . . .
>
> (10) That the public's right to know of the financing of political campaigns . . . far outweighs any right that these matters remain secret and private.

*Id.* The policy declaration directs that the measure's provisions "be liberally construed to promote complete disclosure of all information respecting the financing of political campaigns . . . so as to assure continuing public confidence of fairness of elections . . . and so as to assure that the public interest will be fully protected." *Id.*

The state's current statutory framework contains special registration and disclosure requirements for "political committees." A "political committee" is defined as "any person (except a candidate or an individual dealing with his or her own funds or property) having the expectation of receiving contributions or making expenditures in support of, or opposition to, any candidate or any ballot proposition." WASH. REV. CODE § 42.17.020(39). This definition contains two alternative prongs: an organization can qualify based on an expectation of "receiving contributions" or an expectation of "making expenditures." *Evergreen Freedom Found. v. Wash. Educ. Ass'n (EFF)*, 49 P.3d 894, 902–03 (Wash. Ct. App. 2002). However, each of these prongs has been substantially narrowed through judicial construction. Washington state courts have held that an organization will only qualify as a "political committee" based on an expectation of *receiving* political *contributions* if its contributors have "actual or constructive knowledge" that their funds will be used for electoral political activity.

See id. at 905.[1] To qualify as a "political committee" based on an expectation of *making political expenditures*, an organization must have as "its primary or one of its primary purposes" to support or oppose political campaigns. *See id.* at 903 (internal quotation omitted).

If a group qualifies as a "political committee," it must appoint a treasurer and establish a bank account in the state, WASH. REV. CODE § 42.17.050, .060, and must file a "statement of organization" with the PDC disclosing the names of its officers and any related or affiliated committees or persons, the candidate or ballot proposition that the committee is supporting or opposing, and other information regarding the committee's structure, *id.* § 42.17.040. If the committee intends to raise and spend more than $5,000 in a calendar year or if it intends to raise more than $500 from any one contributor (*see* Rippie Decl. ¶ 43 (Dkt No. 47 at 22)), that committee must make regular reports disclosing, among other things, (1) its funds on hand; (2) the value of any contributions received and the names and addresses of the contributors; and (3) the amounts of any expenditures, the recipients of those expenditures, and the intended purpose. WASH. REV. CODE § 42.17.080, 42.17.090.

Groups that do not qualify as "political committees" must still disclose certain political expenditures. Washington Revised Code § 42.17.100 defines an "independent expenditure" as "any expenditure that is made in support of or in opposition to any candidate or ballot proposition" and is not already required to be disclosed under the rules governing political committees. *Id.* § 42.17.100(1). If any entity incurs more than one hundred dollars of "independent expenditures" in a single campaign or makes an independent expenditure whose value cannot reasonably be estimated, the entity must report the values and recipients of the

---

[1] For example, an organization becomes a "political committee" under this prong if it solicits contributions for a political purpose, if it segregates funds for political purposes, if its organizational documents indicate that it expects to receive political contributions and it has taken steps to implement that expectation, or if it self-identifies to the PDC as a "political committee." (Rippie Decl. ¶ 35 (Dkt. No. 47 at 18).)

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 3

expenditures to the PDC within five days and must thereafter report any additional independent expenditures for the remainder of the campaign in question. *See id.* § 42.17.100(2)–(4).

Washington's statutory framework also contains special requirements for "political advertising," defined to include "any advertising displays, newspaper ads, billboards, signs, brochures, articles, tabloids, flyers, letters, radio or television presentations, or other means of mass communication, used for the purpose of appealing, directly or indirectly, for votes or for financial or other support or opposition in any election campaign." *Id.* § 42.17.020(38). All radio and television political advertising must include its sponsor's name; all written political advertising must include its sponsor's name and address; and all political advertising that constitutes an independent expenditure must explain that it was not authorized by a candidate and, if sponsored by an organization, must identify the organization's top five contributors. *Id.* § 42.17.510; *see also* WASH. ADMIN. CODE § 390-18-010. If political advertising "supporting or opposing a candidate or ballot initiative" is presented to the public within twenty-one days of the election and costs more than one thousand dollars, its sponsor must report the expenditure to the PDC within twenty-four hours of the presentation. *Id.* § 42.17.103.

Finally, Washington Administrative Code § 390-16-206 explains when a "rating, evaluation, endorsement or recommendation for or against a candidate or ballot proposition" must be treated as a reportable expenditure. News media items, features, commentaries, editorials, letters to the editor, and replies thereto, are *not* considered expenditures and need not be reported as such. WASH. ADMIN. CODE § 390-16-206(1), 390-16-313(2)(b), 390-05-290; WASH. REV. CODE § 42.17.020(15)(b)(iv), (21)(c). In all other cases, if and only if an entity makes a "measurable expenditure of funds to communicate" a rating, evaluation, endorsement, or recommendation, the entity must report it as an expenditure according to the general reporting provisions of Washington Revised Code chapter 42.17 outlined above. WASH. ADMIN. CODE § 390-16-206(1).

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 4

**B.**      **Human Life of Washington and Initiative I-1000**

Human Life of Washington ("Plaintiff" or "HLW") is a nonprofit organization incorporated in Washington State. (Compl. ¶ 13 (Dkt. No. 1 at 4).) HLW's "mission is to reestablish throughout our culture, the recognition that all beings of human origin are persons endowed with intrinsic dignity and the inalienable right to life from conception to natural death." (*Id.*) In 1980, HLW created the Human Life Political Action Committee ("HLPAC"), "a political committee connected to Human Life" that would "participate directly in the endorsement of and assistance to, both financially and through campaign involvement, individual candidates running for office." (Krier Decl. Exh. A-1 (Dkt. No. 74 at 6).) HLPAC has, at various times, registered with the PDC as a "political committee," (Parker Decl. ¶ 11 (Dkt. No. 53 at 9:4)), and has filed required disclosure reports with the PDC, (*id.* ¶ 7).

In 1991, Washington voters considered Initiative 119, which would have amended the state constitution to legalize physician-assisted suicide. (Compl. ¶ 18 (Dkt. No. 1 at 5–6).) In that campaign, HLPAC appears to have made numerous direct expenditures to oppose the Initiative, and HLW itself also made contributions to several other political committees in opposition. (Parker Decl. ¶ 8 (Dkt. No. 53 at 4–5).) The Initiative was ultimately defeated.

In 2008, Washington voters considered a similar ballot initiative, I-1000, which proposed to "permit terminally ill, competent, adult Washington residents medically predicted to die within six months, to request and self-administer lethal medication prescribed by a physician." (Compl. ¶ 20 (Dkt. No. 1 at 6–7).) HLPAC explicitly opposed I-1000. *See* Press Release, Human Life PAC, HL PAC Endorsements (July 2008), *available at* http://humanlife.net/view_reports.htm?rpid=31 (last visited Oct. 24, 2008). The initiative appeared on the November 4, 2008 ballot and was passed.

HLW brought this lawsuit in April 2008, before I-1000 had officially qualified for the ballot, against the five members of the PDC, Washington State's attorney general, and King County's prosecuting attorney. (Compl. 1 (Dkt. No. 1).) In the complaint, HLW alleged that it

wished to engage in "issue advocacy" concerning physician-assisted suicide. (*Id.* ¶ 1.)
"Because Physician-assisted suicide is now especially in the public awareness and debate [in light of I-1000], people will be particularly receptive to arguments about the physician-assisted suicide issue, making 2008 an important time for HLW to advocate concerning prolife issues." (*Id.* ¶ 21.) Although the timing of HLW's advocacy was meant to coincide with the I-1000 campaign, it allegedly would not explicitly oppose the initiative. (*Id.* ¶¶ 27–29.)

In the complaint, HLW proposed three specific avenues of advocacy that it intended to pursue. (*Id.* ¶¶ 22–25.) First, the complaint attached an "issue-advocacy fundraising letter" that HLW intended to post on its website and mail or e-mail to a list of potential donors. (*Id.* ¶ 22.) The letter provides:

> The assisted suicide issue just won't go away. But neither will we. We are here to argue the prolife side on your behalf. However, as this grisly issue heats up again in 2008, Human Life of Washington needs your help to pay for some radio ads to educate the public.

(Fundraising Letter at 1 (Dkt. No. 1 at 22).) The letter explicitly references Initiative 119 before stating that "[n]ow, while their minds are focused on the issue, is the opportune time to educate [the people of Washington] on the dangers of assisted suicide—and on the value of every life." (*Id.*) The letter alleges several statistics and anecdotes about Oregon's use of physician-assisted suicide and then states that "The public needs to receive this sort of information as assisted suicide advocates once again offer biased, inaccurate, and rosy depictions of this grisly practice." (*Id.*) Finally, the letter requests that donors send funds to help support HLW's advocacy efforts. (*Id.*)

Second, the complaint describes a "telephone fundraising script" that HLW intended to use to solicit donors over the phone. (Compl. ¶ 23 (Dkt. No. 1 at 7).) After introducing themselves as a representative from HLW, the caller would state:

> Right now we are trying to reach every pro-life household in Washington with an urgent update. As you've probably heard, former Governor Booth Gardner is trying to get an initiative on the ballot this fall that would legalize physician-assisted suicide in the State of Washington. We fear that many Washingtonians

do not know the grisly facts about physician-assisted suicide and its devastating effect on the culture of life.

We need your help at this critical time to get the truth out. . . .

. . . .

We must protect the most vulnerable citizens of our state and we must ensure that patients can trust physicians. Physicians are to be care givers, not life takers. That is why we're pleading for your help.

(Telephone Script (Dkt No. 1 at 24).)

Third, the complaint includes the scripts of four hypothetical radio ads that HLW intended to broadcast. (Compl. ¶ 24 (Dkt. No. 1 at 7).) One of the ads is entitled "Settled," and is a dialogue between a male and a female speaker:

> M:      Assisted suicide is back in the news!
> F:      Didn't we settle that issue?
> M:      We *rejected* a ballot measure.
> F:      Has anything changed?
> M:      We know more about the dangers.
> F:      Such as?
> M:      A new study said one doctor did 23 of the 28 assisted suicides at an Oregon hospice.
> F:      Sounds like a Kevorkian!
> M:      And it said one man seemed rushed into it . . . then took hours to die after the drugs. Wife left . . . couldn't take it . . . so depressed that *she* attempted suicide.
> F:      All reasons *not* to reconsider the issue.
> Narrator:      Paid for by Human Life of Washington.

(HLW Ads (Dkt. No. 1 at 25) (emphasis in original).) Another ad is entitled "Trust":

> F:      Whatever happened to the Hippocratic Oath?
> M:      You mean the part that says, "I will neither give a deadly drug to anybody who asked for it, nor will I make a suggestion to this effect?"
> F:      Exactly. It was a quantum leap in medicine when you knew that you could always trust your doctor. Before that, who knew whether he'd been hired by a family member to hurry up the inheritance?
> M:      That trust is the foundation of medicine.
> F:      Assisted suicide removes it . . . turns doctors into killers. That's dangerous.
> Narrator:      Paid for by Human Life of Washington.

(*Id.*)

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 7

1    The specific examples provided in the complaint were not intended to be exclusive;

2    rather, HLW allegedly intended to do "these and substantially-similar fundraising and public

3    communications in support of its Physician-assisted suicide issue advocacy in 2008." (Compl.

4    ¶ 25 (Dkt. No. 1 at 7–8).) The complaint explained that the "substantially similar" fundraising

5    and communications had not yet been created and would vary as the public debate on the issue

6    evolved. (*Id.*)

7        HLW argues that it has a constitutional right to engage in this sort of "issue advocacy"

8    without submitting to Washington State's disclosure requirements. (*Id.* ¶ 38.) HLW claims to

9    reasonably fear that the PDC would consider HLW to be a "political committee" under

10   Washington Revised Code § 42.17.020(39) if it undertook its proposed actions, or would

11   consider the individual actions themselves to be "independent expenditures" under Washington

12   Revised Code § 42.17.100, "political advertising" under § 42.17.020(38), or "rating[s],

13   evaluation[s], endorsement[s], or recommendation[s] for or against . . . a ballot measure" under

14   Washington Administrative Code § 390-16-206. (*Id.* ¶¶ 34–37.) Because any such

15   determinations by the PDC would subject HLW to disclosure requirements under Washington

16   State law and civil penalties for noncompliance, HLW claims that it is chilled from engaging in

17   protected First Amendment activities as a result of the State's campaign finance laws. (*Id.*

18   ¶ 38.)

19       On April 18, 2008, HLW moved for a preliminary injunction to prohibit enforcement of

20   Washington State's reporting and disclosure requirements, both facially and as applied to

21   Plaintiff and its proposed "issue advocacy." (Dkt. No. 8.) The Court held that HLW had

22   standing to bring its claims (Prelim. Inj. Order at 3–5 (Dkt. No. 59)); however, it ultimately

23   denied the motion, finding that Plaintiff had failed to establish a probable likelihood of success

24   on the merits and that the interests of the State and the public outweighed the potential harm to

25   HLW, (*id.* at 5–9).

26

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 8

1       HLW now moves for summary judgment, claiming that "[t]here are no material facts in

2  dispute[1] and HLW is entitled to judgment as a matter of law." (Mot. 1 (Dkt. No. 67).)

3  **II.     DISCUSSION**

4       **A.     Legal Standard**

5       Under Federal Rule of Civil Procedure 56(c), the Court shall grant summary judgment

6  "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that

7  there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

8  matter of law." FED. R. CIV. P. 56(c). "In determining whether summary judgment is

9  appropriate, we view the facts in the light most favorable to the non-moving party and draw

10  reasonable inferences in favor of that party." *Scheuring v. Traylor Bros., Inc.*, 476 F.3d 781,

11  784 (9th Cir. 2007).

12       **B.     Justiciability**

13            **1.     Ripeness and Standing**

14       Defendants first argue that "HLW has failed to state facts of sufficient specificity to

15  demonstrate an actual controversy," (Response 12 (Dkt. No. 70)), as required under the

16  constitutional doctrines of ripeness and standing. *See Thomas v. Anchorage Equal Rights

17  Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) ("Whether the question is viewed as one of

18  standing or ripeness, the Constitution mandates that prior to our exercise of jurisdiction there

19  exist a constitutional 'case or controversy,' that the issues presented are definite and concrete,

---

[1] HLW's motion provides only cursory facts and instead sets forth its factual allegations in a separately-filed Statement of Material Undisputed Facts. (Dkt. No. 68). Defendants argue that the Statement of Material Undisputed Facts should be struck "[b]ecause this pleading is not among those authorized by Fed. R. Civ. P. 7 and Local Rule 7, and because this Court's July 15 Minute Order (Dkt. No. 65) did not allow any overlength briefs." (Response 2 (Dkt. No. 70).) The Court agrees, and hereby STRIKES Plaintiff's Statement of Material Undisputed Facts. However, because the facts contained in this document were, for the most part, all presented in Plaintiff's Verified Complaint, (Reply 1 (Dkt. No. 78) (noting that the Statement of Material Undisputed Facts merely "stat[es] in convenient form the facts from the *Verified Complaint*.")), the Court's summary judgment analysis is unaffected.

not hypothetical or abstract." (internal quotation omitted)). Defendants claim that HLW has not specified with sufficient certainty the advocacy actions that it intended to take. (Response 11–12 (Dkt. No. 70).) They note that the Complaint, after describing specific fundraising and advertising scripts, states only that "HLW intends to do these *and substantially-similar* fundraising and public communications." (Compl. ¶ 25 (Dkt. No. 1 at 7–8) (emphasis added).) They point to deposition testimony by HLW's CEO that the organization was "not tied to those four specific [advertising] scripts." (Kennedy Dep.. 92:3–5 (Dkt. No. 71 at 31).) Finally, Defendants note that the text of HLW's proposed radio scripts were prepared "in discussion with attorneys" (*id.* at 101), suggesting that the language was concocted specifically for this legal challenge, (Response 12 (Dkt. No. 70).)

The Court rejected a similar justiciability argument when ruling on HLW's motion for preliminary injunction. (Prelim. Inj. Order 3–5 (Dkt. No. 59).) The Ninth Circuit has recognized that in First Amendment challenges, "the Supreme Court has dispensed with rigid standing requirements." *Cal. Pro-Life Council, Inc. v. Getman (CPLC I)*, 328 F.3d 1088, 1094 (9th Cir. 2003). In such a case, "self-censorship" will constitute a "constitutionally sufficient injury," *id.* at 1093, if Plaintiff has established "an actual and well-founded fear" that the challenged statute will be enforced against it, *id.* at 1095. A well-founded fear of prosecution exists whenever the "intended speech arguably falls within the statute's reach." *Id.*

As the Court has already recognized, HLW's proposed actions all "arguably" fall within the reach of the challenged Washington disclosure statutes. (Prelim. Inj. Order 4–5 (Dkt. No. 59).) HLW intended to run advertisements opposing physician-assisted suicide just as Washington voters were debating the legalization of that very conduct; as a result, HLW's actions were at least arguably made "in . . . opposition to" the I-1000 ballot initiative. If so, HLW arguably would have qualified as a "political committee" under state law, *see* WASH. REV. CODE § 42.17.020(39) (defining a "political committee" as "any person (except a candidate or an individual dealing with his or her own funds or property) having the

expectation of receiving contributions or making expenditures in support of, or opposition to, any candidate or any ballot proposition"), and its intended advertising expenditures might have qualified as "independent expenditures," *see id.* § 42.17.100(1) ("[T]he term 'independent expenditure' means any expenditure that is made in support of or in opposition to any candidate or ballot proposition and is not otherwise required to be reported . . . ."), or as "political advertising," *see id.* § 42.17.020(38) ("'Political advertising' includes any advertising . . . used for the purpose of appealing, directly or indirectly, for votes or for financial or other support or opposition in any election campaign."). Finally, although more of a stretch, at least one of HLW's proposed advertisements could arguably be considered a "rating, evaluation, endorsement or recommendation" against I-1000 subject to Washington Administrative Code § 390-16-206. (*See, e.g.*, HLW "Settled" Ad (Dkt. No. 1 at 25) (noting that "[a]ssisted suicide is back in the news" after Washington voters previously "*rejected* a ballot measure" and providing several reasons "*not* to reconsider the issue" (emphasis in original)).)

Plaintiff's proposed actions are sufficiently concrete to render the case justiciable. HLW produced (1) a written fundraising letter, (2) a telephone fundraising script, and (3) four broadcast radio scripts. (Compl. ¶ 22–24 (Dkt. No. 1 at 7).) That HLW intended to engage in "these *and* substantially-similar fundraising and public communications" (*id.* ¶ 25 (emphasis added)) did not render the specific proposed actions any less concrete. Similarly, the Court finds the case justiciable, even if HLW was "not tied to those four specific scripts." (Kennedy Dep.. 92:3–5 (Dkt. No. 71 at 31).) Plaintiff desired to engage in a broad debate with Washington voters, but self-censored itself out of fear of government regulation. (Compl. ¶¶ 19, 34–37 (Dkt. No. 1).) To establish standing, Plaintiff need not predict every last expressive position that it would have taken in the debate; that would set an impossibly high bar for Plaintiffs, given the fluid nature of political and philosophical discourse. (*See id.* ¶ 25 ("[I]t is in the nature of issue advocacy that the need to convey information and educate varies as

public debate on an issues varies, so . . . it is impossible to predict [exactly] what future issue-advocacy might be required . . . .") (internal quotation omitted).) To raise a justiciable claim, Plaintiff need only provide a "concrete plan" of action that would implicate the government's regulatory scheme. *See CPLC I*, 328 F.3d at 1094. The Complaint maintained that all of HLW's issue advocacy would be "substantially similar" to the specifically proposed actions, and nothing in the record suggests that any of HLW's actions would have materially differed from the scripts it provided. (Compl. ¶ 25 (Dkt. No. 1).) Therefore, the Court finds that HLW's proposed actions constituted a sufficiently "concrete plan" to bless Plaintiff with standing.

Finally, the Court finds it unremarkable that HLW's advertising scripts were drafted in "discussion with attorneys." (Kennedy Dep. 101 (Dkt. No. 71 at 33).) This is a nuanced area of the law, where the state has a well established power to regulate speech, *see Buckley v. Valeo*, 424 U.S. 1, 13 (1976) (per curiam), and where the state's power sometimes turns on fine distinctions in the content of the regulated speech, *see, e.g.*, *FEC v. Furgatch*, 807 F.2d 857, 863–64 (9th Cir. 1987). Given the legal ramifications of HLW's proposed phrasing, Plaintiff's discussion with its attorneys in drafting the language of its ads does not raise any suggestion of bad faith.

## 2. Mootness

Although the November 4, 2008, election has come and gone, HLW's claim is not moot. *See Ala. Right to Life Comm. v. Miles (ARTLC)*, 441 F.3d 773, 779–80 (9th Cir. 2006); *CPLC I*, 328 F.3d at 1095 n.4; *Porter v. Jones*, 319 F.3d 483, 490 (9th Cir. 2003). "[E]lection cases often fall within the 'capable of repetition, yet evading review' exception to the mootness doctrine . . . ." *ARTLC*, 441 F.3d at 779 (internal quotation omitted). That exception applies where "(1) the challenged action was too short in duration to be fully litigated prior to its cessation or expiration; and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again." *Porter*, 319 F.3d at 489–90. The Ninth Circuit has repeatedly noted that "the inherently brief duration of an election is almost

invariably too short to enable full litigation on the merits." *Id.* at 490; *CPLC I*, 328 F.3d at 1095 n.4 (*quoting Porter*, 319 F.3d at 490); *ARTLC*, 441 F.3d 779 (*quoting CPLC I*, 328 F.3d at 1095 n.4). Moreover, HLW has asserted its continuing intention to advocate for an "inalienable right to life from conception to natural death" "as it has in the past." (Compl. ¶¶ 1, 13 (Dkt. No. 1).) The Court finds a reasonable expectation that HLW may, at some point, again desire to advocate on the topic of a future Washington State ballot initiative in a manner arguably covered by the State's disclosure requirements. *See ARTLC*, 441 F.3d at 779–80. Therefore, the instant action is not moot.

### C.  Merits

Political speech is at the core of the First Amendment. A functioning democracy relies on passionate advocacy, and a robust "marketplace of ideas" requires free and open debate concerning issues of political concern. "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution," and hence is afforded "the broadest protection" under the First Amendment. *Buckley*, 424 U.S. at 14.

First Amendment protection, however, is not absolute. *Id.* at 25. The government may regulate protected speech, so long as the restrictions are justified, meaning that they survive judicial scrutiny under the applicable standard of review. "[T]he severity of the burden the election law imposes on the plaintiff's rights dictates the level of scrutiny applied by the court." *Ala. Independence Party v. Alaska*, 545 F.3d 1173, 1177 (9th Cir. 2008) (internal quotation omitted). "Severe" burdens on protected speech are reviewed under strict scrutiny—they must be narrowly tailored to serve a compelling state interest. *Id.* Lesser burdens on protected speech have been reviewed under less rigorous scrutiny. *See, e.g.*, *McConnell v. FEC*, 540 U.S. 93, 136 (2003) (holding that contribution limits need only satisfy "the lesser demand of being 'closely drawn' to match a 'sufficiently important interest'" (internal quotations omitted)); *Buckley*, 424 U.S. at 64 (subjecting disclosure requirements to "exacting

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 13

scrutiny," whereby there must exist a "relevant correlation" or "substantial relation" between the governmental interest and the burden imposed). Although courts have often treated these as distinct standards, they are somewhat fluid in practice. Each standard considers the *degree* of burden imposed on the speaker—the more significant the burden, the more compelling the state interest needed to justify that burden. *See, e.g.*, *ARTLC*, 441 F.3d at 791 (applying strict scrutiny to reporting and disclosure requirements, but upholding the provisions in part because the burdens were "not particularly onerous").

Restrictions on speech must also not be unconstitutionally vague. Vagueness challenges can take either of two forms. First, a statute's phrasing might simply be "so indefinite [that it] fails to clearly mark the boundary between permissible and impermissible speech." *Buckley*, 424 U.S. at 41 (holding that the prohibition on certain expenditures "relative to" a candidate was vague in this manner). These sorts of vagueness challenges are generally limited to criminal statutes, *see id.* at 40–41; Richard H. Fallon, Jr., *Making Sense of Overbreadth*, 100 Yale L. J. 853, 903–04 (1991) ("Vagueness doctrine, in its most familiar form, holds that criminal prohibitions, at least, may not be enforced when they are so unclear that people of ordinary intelligence would need to guess at whether their conduct was or was not forbidden."), and may be resolved through narrowing constructions, *see, e.g.*, *Buckley*, 424 U.S. at 42 (reading "the phrase 'relative to' a candidate . . . to mean 'advocating the election or defeat of' a candidate"). The second type of vagueness challenge is often described as a subset of the related First Amendment overbreadth doctrine. *See* Fallon, *supra*, at 904; *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983) ("[W]e have traditionally viewed vagueness and overbreadth as logically related and similar doctrines."). Under this theory, a statute is deemed unconstitutional on its face if it "chills" a "substantial amount of legitimate speech." *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1152 (9th Cir. 2001) ("A statute's vagueness exceeds constitutional limits if its deterrent effect on legitimate expression is both real and substantial, and if the statute is not readily subject to a narrowing construction by the

state courts." (internal quotation omitted)); *see also Buckley*, 424 U.S. at 42–44 (further narrowing the definition of "advocating the election or defeat of" a candidate to include only *express* advocacy because the broader definition could substantially chill the general discussion of public issues).

HLW challenges Washington's reporting requirements for "political committees," disclosure requirements for "independent expenditures" and "political advertising," and its treatment of "ratings, evaluations, endorsements, and recommendations." The Court considers each of these four challenges in turn.

### 1. Reporting Requirements for "Political Committees"

HLW focuses its challenge primarily on Washington's requirements for "political committees," which it refers to as "PAC-style" reporting and disclosure. (Mot. 4 (Dkt. No. 67).)[2] Washington requires "political committees" to appoint a treasurer, establish a bank account in the state, and register with the PDC by filing a "statement of organization," which must be updated as material facts change. WASH. REV. CODE § 42.17.040, .050, .060. For many organizations—those that raise and spend less than $5,000 per year and that do not accept more than $500 from any single contributor—these are the only requirements that attach from "political committee" status. (Rippie Decl. ¶ 26 (Dkt. No. 47 at 14) (noting that such organizations qualify for "mini reporting").) All other, more active "political committees" must file regular reports with the PDC to disclose their contributions, expenditures, and funds on hand. WASH. REV. CODE § 42.17.080, .090.

To qualify as a "political committee," an organization must satisfy either of two prongs. First, an organization is a "political committee" if it has an "expectation of *receiving contributions* . . . in support of, or opposition to, any candidate or any ballot proposition." WASH. REV. CODE § 42.17.020(39). To qualify under this prong, the organization must have

---

[2] "PAC" stands for "political action committee."

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 15

taken some step to give its contributors "actual or constructive knowledge" that donated funds will be used for electoral political activity. *EFF*, 49 P.3d at 905. Second, an organization is a "political committee" if it has "an expectation of . . . *making expenditures* in support of, or opposition to, any candidate or any ballot proposition." WASH. REV. CODE § 42.17.020(39). To qualify under this second prong, the organization must have as "one of its primary purposes" to support or oppose political campaigns. *EFF*, 49 P.3d at 903.

HLW argues that Washington's PAC-style requirements do not survive strict scrutiny and that the state's definition of "political committee" is vague and overbroad.

### (a) "Strict Scrutiny" vs. "Exacting Scrutiny"

As an initial matter, the parties disagree as to which standard the Court should employ in considering whether Washington's "political committee" requirements are justified. HLW argues that the imposition of PAC-style requirements must satisfy "strict scrutiny," i.e., it must be "narrowly tailored" to achieve a "compelling" government interest. *FEC v. Wis. Right to Life, Inc. (WRTL)*, 127 S. Ct. 2652, 2664 (2007). In contrast, Defendants argue that it need only meet "exacting scrutiny," which requires a "substantial relation . . . between the governmental interest and the information required to be disclosed." *ARTLC*, 441 F.3d at 787 (internal quotation omitted).

The Ninth Circuit has recognized that "the Supreme Court has been less than clear as to the proper level of scrutiny" for PAC-style requirements, *CPLC I*, 328 F.3d at 1101 n.16; *see also ARTLC*, 441 F.3d at 787 (noting again that the "degree of scrutiny . . . is somewhat unclear"); however, it has resolved that ambiguity in favor of strict scrutiny. In *CPLC I*, the Court held that California's PAC-style requirements on ballot-initiative political committees should be subjected to strict scrutiny and remanded to the district court to conduct the analysis in the first instance. 328 F.3d at 1101 n.16, 1104. Later, in *ARTLC*, another Ninth Circuit panel suggested that *McConnell* might have relaxed the degree of scrutiny since *CPLC I*, but the Court nonetheless "assume[d] without deciding that strict scrutiny applie[d]." 441 F.3d 787–

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 16

88. Finally, in *Cal. Pro-Life Council, Inc. v. Randolph (CPLC II)*, 507 F.3d 1172 (9th Cir. 2007), when the district court's application of strict scrutiny was back to the Ninth Circuit on appeal, the Court explicitly held that strict scrutiny should still apply. *Id.* at 1177–78. In a footnote, the Court noted that it was "bound by the 'law of the case' to apply strict scrutiny," *id.* at 1177 n.5, but the opinion's text also makes clear that *CPLC I* is still binding precedent. *Id.* at 1178 ("Because . . . the *McConnell* decision [did not] call[] into question the analysis [of the cases relied upon in *CPLC I*], we are not compelled to abandon the standard adopted in [*CPLC I*]."). As a result, the Court finds that it is bound by *CPLC I* and *CPLC II* to apply strict scrutiny to Washington's PAC-style requirements.

### (b) Strict Scrutiny Applied: Burdens and Interests

Although *CPLC I* and *II* make clear that strict scrutiny should apply to PAC-style requirements, the cases do not explicitly demonstrate how to apply such scrutiny in practice. In *CPLC I*, the Court remanded to the district court to apply strict scrutiny after further development of the factual record. 328 F.3d at 1105, 1107. On remand, however, rather than develop a factual record to support its regulations, the State of California simply argued that it could impose its requirements on CPLC as a matter of law, pointing to federal campaign finance laws that required "all groups organized in corporate form, including non-profit corporations, to channel express campaign advocacy through PACs." *See CPLC II*, 507 F.3d at 1187. On appeal, the Ninth Circuit acknowledged that courts had upheld broad imposition of PAC-style requirements on corporate campaign speech, but noted that each of those cases applied to *candidate elections* and explained that "it is not at all certain that the Supreme Court would apply the same criteria to ballot measure advocacy." *Id.* at 1187–88. Because this was California's sole argument, the Court found that the state had "not satisfied its burden" of demonstrating that its PAC-style requirements were narrowly tailored to its compelling informational interest. *Id.* at 1187. The Court made clear that one cannot "ignore the distinction between candidate and ballot measure elections." *Id.* at 1187. However, in holding California

1  to its failed burden, the Court never actually analyzed whether the state's compelling interest

2  *could* have justified its PAC-style requirements in the ballot initiative context.

3      The Ninth Circuit did apply strict scrutiny to PAC-style requirements in *ARTLC*. 441

4  F.3d 773. Unlike *CPLC I* and *CPLC II*, that case did not involve ballot initiatives, but its

5  analysis is informative nonetheless. In *ARTLC*, the Court reviewed reporting and disclosure

6  requirements that applied to certain nonprofit, ideological corporations that wished to influence

7  the outcome of an election. *Id.* at 779. The State of Alaska required these corporations to

8  (1) register with the state's election commission and make regular reports, (2) report all

9  expenditures and contributions, (3) notify contributors and potential contributors that

10 contributions may be used to influence an election, and (4) disclose the source of their

11 expenditures within the relevant communications. *Id.* at 789–91. In applying strict scrutiny, the

12 Court "'look[ed] to the extent of the burden . . . place[d] on individual rights,'" *id.* at 791

13 (*quoting Buckley*, 424 U.S. at 68), and found that the burdens imposed under Alaska's statute

14 were "not particularly onerous," *id.* In upholding Alaska's PAC-style requirements, the Court

15 emphasized that they did not impose any limits on the organization's ability to solicit funds,

16 nor did they require broad structural changes like the use of "segregated funds" for political

17 activity. *Id.* at 791 (distinguishing Alaska's requirements from those struck down by the

18 Supreme Court in *FEC v. Mass. Citizens for Life (MCFL)*, 479 U.S. 238 (1986)).

19      *ARTLC* applied to candidate elections, so this Court is sensitive to not apply that

20 holding directly to ballot measures, where the state has somewhat different interests. *See CPLC*

21 *II*, 507 F.3d at 1188. That said, the *burden* of PAC-style requirements are the same regardless

22 of whether the organization's advocacy relates to a candidate election or a ballot initiative.

23 Therefore, this Court gives great weight to the Ninth Circuit's finding in *ARTLC* that PAC-

24 style requirements are "not particularly onerous." 441 F.3d at 791. Washington's "political

25 committee" requirements are similar to those upheld in *ARTLC* and contain neither of the more

26 severe burdens on solicitation or segregation of funds that the courts flagged in that case. *See*

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 18

1  *id.* The only notable difference between the Washington and Alaska provisions is that

2  Washington also requires "political committees" to (1) designate a treasurer (i.e., someone at

3  the committee who will be "responsible for . . . complying with the disclosure requirements"

4  (Response 15 (Dkt. No. 70))) and (2) maintain an in-state bank account. Defendants

5  convincingly argue that these minor burdens are necessary for enforcement and "nothing more

6  than the basic administrative infrastructure necessary to implement the disclosure

7  requirements." (*Id.* at 18.)

8       Washington has also significantly narrowed its reporting and disclosure requirements to

9  focus only on the most active political committees. First, to qualify as a political committee

10 under the "maker of expenditures" prong, the organization "must have as its primary or one of

11 the primary purposes to affect, directly or indirectly, governmental decision making by

12 supporting or opposing candidates or ballot propositions." *EFF*, 49 P.3d at 903. To qualify

13 under the "receiver of contributions" prong, an organization must have taken some affirmative

14 step to give its contributors "actual or constructive knowledge that the organization is setting

15 aside funds to support or oppose a candidate or ballot proposition." *Id.* at 904–05.[3] Finally,

16 many of the organizations that technically qualify as "political committees" are exempted from

17 the regular reporting requirements and need only file the initial registration. (Rippie. Decl. ¶ 26

18 (Dkt. No. 47 at 14).) The full reporting requirements are limited to those committees that

19 expect to raise or spend more than $5000 or receive more than $500 from a single contributor.

20 (*Id.*) By imposing the more burdensome reporting requirements—which are still "not

21 particularly onerous," *ARTLC*, 441 F.3d at 791—only on the most active political committees,

22 the state avoids unduly burdening the smaller or less active organizations that might be more

23 likely to self-censor their speech rather than comply with the state's requirements.

24 _____

25 [3] HLW argues that Washington must go further and limit PAC-status to organizations whose *single* major purpose is campaign advocacy (Mot. 10 (Dkt. No. 67)) or who have received contributions that are *explicitly earmarked* for political advocacy (*Id.* at 18.) The

26 Court addresses, and rejects, these arguments in sections II.C.1(d) and II.C.1(e), respectively.

Having determined that Washington's PAC-style requirements impose only relatively minor burdens and focus those burdens on the political committees most able and willing to comply, the Court must consider whether these burdens are justified by compelling state interests. In *Buckley*, the Supreme Court identified three compelling rationales for requiring disclosure of "campaign speech" in candidate elections. "First, disclosure provides the electorate with information as to where political campaign money comes from and how it is spent by the candidate, in order to aid voters in evaluating those who seek federal office." 424 U.S. at 66–67 (internal quotation omitted). "Second, disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity." *Id.* at 67. "Third, and not least significant, recordkeeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of . . . contribution limitations . . . ." *Id.* at 67–68. In *ARTLC*, the Ninth Circuit cited these same three interests in upholding Alaska's PAC-style requirements. *See* 441 F.3d at 792 (holding that Alaska's minor registration and reporting burdens were narrowly tailored to the state's interest in "'providing the electorate with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce more substantive electioneering restrictions.'" (*quoting McConnell*, 540 U.S. at 196)).

In *CPLC I*, the Ninth Circuit noted that *Buckley*'s second and third rationales generally do not apply in ballot initiative elections, where there is little threat of corruption and typically no limit on contributions or expenditures. 328 F.3d at 1105 n.23 (9th Cir. 2003). However, the Court held that the first "informational" interest "appl[ies] just as forcefully, if not more so, for voter-decided ballot measures." *Id.* at 1105. The Court explained:

> "Even more than candidate elections, initiative campaigns have become a money game, where average citizens are subjected to advertising blitzes of distortion and half-truths and are left to figure out for themselves which interest groups pose the greatest threat to their self-interest." David S. Broder, *Democracy Derailed: Initiative Campaigns and the Power of Money* at 18

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 20

> (2000). Knowing which interested parties back or oppose a ballot measure is critical, especially when one considers that ballot measure language is typically confusing, and the long-term policy ramifications of the ballot measure are often unknown. At least by knowing who backs or opposes a given initiative, voters will have a pretty good idea of who stands to benefit from the legislation.
>
> . . . .
>
> Voters act as legislators in the ballot-measure context, and interest groups and individuals advocating a measure's defeat or passage act as lobbyists; both groups aim at pressuring the public to pass or defeat legislation. [The voters], as lawmakers, have an interest in knowing who is lobbying for their vote, just as members of Congress may require lobbyists to disclose who is paying for the lobbyists' services and how much.

*Id.* at 1105–06. The state's interest in informing the electorate about "where political campaign money comes from and how it is spent," *Buckley*, 424 U.S. at 66 (internal quotation omitted), is only amplified in the ballot initiative context as more and more money is poured into ballot measures nationwide. *See CPLC II*, 328 F.3d at 1105; *cf.* Lisa Leff, *California Gay Marriage Ban a $73 Million Race*, THE MERCURY NEWS, Nov. 3, 2008, *available at* http://www.mercurynews.com/news/ci_10889066 (noting that California's Proposition 8 was "the costliest election this year outside the race for the White House"). The state therefore retains an extremely compelling interest in "following the money" in ballot initiative elections so that the electorate's decision may be an informed one.

Defendants also raise a compelling interest in protecting the *contributors* of funds used to advocate in support of or in opposition to a ballot initiative. (Rippie Decl. ¶ 29 (Dkt. No. 47 at 16).) Those contributors are entitled to verify that their funds were actually used for their intended purpose. (*See id.* (describing a "high profile enforcement case . . . where the public's contributions to the ballot measure committee were unlawfully used by an officer for his personal expenses for activities unrelated to the campaign, and those facts had been concealed from the public by the treasurer and the committee").) In this respect, the requirements that Washington imposes on "political committees" serve the same goals as the registration and disclosure requirements that most states impose on charities. (*Id.*) The Supreme Court has "repeatedly recognized the legitimacy of government efforts to enable donors to make

informed choices about their charitable contributions." *Illinois v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 623 (2003). The Court has also suggested that reporting and disclosure provisions are among the "more benign and narrowly tailored options" available to address these concerns. *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 800 (1988); *see also Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 638 (1980) (suggesting that "disclosure of the finances of charitable organizations" could prevent fraud "by informing the public of the ways in which their contributions will be employed"). "In accord with [these cases], . . . in almost all of the states and many localities, charities and professional fundraisers must register and file regular reports on activities, particularly fundraising costs." *See Telemarketing Assocs.*, 528 U.S. at 623 (internal quotation omitted) (noting that "[t]hese reports are generally available to the public"). The state's interest in preventing fraudulent misuse of contributed funds appears just as compelling when applied to an organization like HLW as when applied to the charitable organizations discussed in *Telemarketing Associates*.

The Court holds that these two compelling interests—informing the public about the source of political expenditures and protecting contributors from fraudulent misuse of donations—more than justify the general imposition of PAC-style reporting and disclosure requirements on organizations engaged in ballot measure advocacy. However, the Court must still address several aspects of Washington's specific framework that HLW argues are vague or overbroad.

(c)     **"in support of, or opposition to"**

Under Washington's statute, an organization becomes a "political committee" if it expects to receive contributions or make expenditures "in support of, or opposition to, any candidate or any ballot proposition." WASH. REV. CODE. § 42.17.020(39). HLW first argues that the "political committee" definition is unconstitutionally vague because the words "support" and "opposition" are so indefinite that they do not "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of*

*Rockford*, 408 U.S. 104, 108 (1972). HLW also argues that the provision is unconstitutionally broad because it could be read to include expenditures that do not "expressly" advocate for a ballot initiative, but instead merely advocate as to an underlying "issue." (Mot. 11–17 (Dkt. No. 67).)

As to the ambiguity of the words themselves, there are several features of Washington's framework that partially alleviate any vagueness concerns. First, in addressing this sort of vagueness argument, "[c]lose examination of the specificity of the statutory limitation is required where . . . the legislation imposes *criminal* penalties." *Buckley*, 424 U.S. at 40–41 (emphasis added). HLW concedes that, unlike the federal statute at issue in *Buckley*, Washington's PAC-style requirements do *not* carry criminal penalties. (Mot. 12 n.2 (Dkt. No. 67).) Second, Washington provides various ways to obtain advice or guidance from the PDC: one can call a toll-free phone number, request an informal advisory opinion, request a formal declaratory order, WASH. ADMIN. CODE § 390-12-250, request an interpretative statement, WASH. REV. CODE § 34.05.230(1), or petition for formal rulemaking, WASH. ADMIN. CODE § 390-12-255. (Rippie Decl. ¶ 21–22 (Dkt. No. 47 at 11–12).) In *Buckley*, the Court suggested that the wide availability of advisory opinions would alleviate many vagueness problems; however, it did not apply in that case "because the vast majority of individuals and groups subject to [the] criminal sanctions . . . do not have a right to obtain an advisory opinion from the [FEC]." 424 U.S. at 40 n.47. In contrast, Washington's framework appears to provide ample opportunity to obtain a pre-enforcement interpretation from the PDC.

Furthermore, HLW's vagueness argument would fail even without these considerations because the Supreme Court has explicitly held that the words "support" and "oppose" are not unconstitutionally vague. In *McConnell*, the Court considered certain limitations on contributions and expenditures for "public communications" that "'refer[] to a clearly identified candidate for Federal office' and 'promote[],' 'support[],' 'attack[],' or 'oppose[]' a

candidate for that office." 540 U.S. at 162. The Court rejected an argument that these limitations were unconstitutionally vague, holding:

> The words "promote," "oppose," "attack," and "support" clearly set forth the confines within which potential party speakers must act in order to avoid triggering the provision. These words "provide explicit standards for those who apply them" and "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited."

*Id.* at 170 n.64 (*quoting Grayned*, 408 U.S. at 108–09); *see also id.* at 184–85 (rejecting the same vagueness argument for a provision that did not involve party speakers). In light of *McConnell*, this Court holds that the mere use of the terms "support" and "opposition" does not render Washington's definition of "political committee" unconstitutionally vague. *See United States v. Williams*, 128 S. Ct. 1830, 1845 (2008) ("[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." (internal quotation omitted)).

HLW's overbreadth argument, however, raises a closer question and requires more extensive analysis. Essentially, Plaintiff argues that "issue advocacy"—political speech that does not expressly advocate the election or defeat of a candidate or ballot initiative—can never be regulated under the First Amendment. (Mot. 14 (Dkt. No. 67).) Under this theory, Washington's definition of "political committee" is unconstitutional because it could be read to include expenditures for communications that do not *expressly* support or oppose the ballot initiative in question.

The distinction between "express advocacy" and "issue advocacy" was first established in *Buckley*. In that case, the Court considered the constitutionality of the Federal Election Campaign Act of 1971 (FECA). *Buckley*, 424 U.S. at 6. In particular, the Court examined provisions that (1) limited individual *contributions* to $1000 for any single candidate per election; (2) limited individual or group *expenditures* "relative to a clearly identified candidate" to $1000 per year; and (3) required *disclosure* and reporting of contributions and expenditures above certain threshold levels. *Id.* at 7. The Court upheld the contribution limits,

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 24

finding they had only a "limited effect upon First Amendment freedoms" and that these effects

were justified by "weighty interests." 424 U.S. at 29. The expenditure ceiling, however,

"impose[d] significantly more severe restrictions on protected freedoms," operating as an

outright prohibition of speech subject to criminal penalties. *Id.* at 19–20, 23. The Court initially

interpreted the indefinite phrase "relative to a candidate" to mean "advocating the election or

defeat of a candidate," *id.* at 42 (internal quotation marks omitted); however, this narrowed

definition still raised First Amendment concerns. "Candidates, especially incumbents, are

intimately tied to public issues involving legislative proposals and governmental actions." *Id.*

The only way to determine whether public discussion of these issues advocated for or against

the candidate would be to measure either the subjective intent of the speaker or the predicted

effect on the listener. *Id.* at 43. Because neither intent nor effect can be measured with any

certainty, the expenditure limits could chill speech on a huge range of issues. *Id.* Therefore, to

avoid vagueness and overbreadth concerns, the Court further narrowed the definition of

"expenditure" to cover only "communications that in *express terms* advocate the election or

defeat of a clearly defined candidate." *Id.* at 44 (emphasis added). So narrowed, the Court

found the expenditure limits utterly ineffective, since groups and individuals could still

advocate for or against a candidate so long as they "eschew[ed] expenditures that [did so] in

express terms." *Id.* at 45 ("The exacting interpretation of the statutory language necessary to

avoid unconstitutional vagueness thus undermines the limitation's effectiveness . . . .").

Because the expenditure ceiling did not effectively further the state's interest, it did not survive

strict scrutiny. *Id.* at 50. Finally, in order to avoid similar overbreadth concerns, the Court

applied this same narrow definition of "expenditure" to the FECA's disclosure requirements,

which it upheld. *Id.* at 80.

   Since *Buckley*, the distinction between "express advocacy" and "issue advocacy" has

proved problematic. In *McConnell*, the Supreme Court considered a challenge to the Bipartisan

Campaign Reform Act of 2002 (BCRA), which was passed in part to address the proliferation

of "campaign advertising masquerading as issue ads." 540 U.S. at 132 (internal quotation omitted). To address this problem, the BCRA defined an "electioneering communication" as any "broadcast, cable, or satellite communication" that "refers to a clearly identified candidate;" is made within a certain period of time before an election, primary, or convention; and, for regional candidates, is "targeted to the relevant electorate." *Id.* at 189–90. The statute required disclosure of "electioneering communications" and also prohibited corporations and labor unions from financing such communications through their treasury funds. *Id.* at 190. The challengers noted that this definition went far beyond the "express advocacy" approved in *Buckley* and argued that the BCRA's provisions therefore constituted impermissible regulation of issue advocacy. *Id.* The Court rejected the notion that "*Buckley* drew a constitutionally mandated line between express advocacy and so-called issue advocacy," instead characterizing the *Buckley* holding as a matter of statutory, rather than constitutional, interpretation. *Id.* at 190. The Court upheld the disclosure requirements, noting that they "do not prevent anyone from speaking" and serve "an important function in informing the public about various candidates' supporters *before* election day." *Id.* at 201 (emphasis in original) (internal quotation omitted). The Court also upheld the prohibition for corporations and unions, holding that the justifications for restricting such speech extended at least to all speech that was the "functional equivalent of express advocacy," which included for the "vast majority" of issue ads. *Id.* at 206.

Four years later, however, the Supreme Court considered an as-applied challenge to the same BCRA prohibition on corporate and union speech that it had facially upheld in *McConnell*. *WRTL*, 127 S. Ct. at 2659. In the Court's primary opinion, Chief Justice Roberts, joined by Justice Alito, noted that *McConnell* had only explicitly upheld the prohibition for communications that were the "functional equivalent of express advocacy." *Id.* Whereas the Court in *McConnell* appeared to take a broad view of this term, *see McConnell*, 540 U.S. at 126 ("While the distinction between 'issue' and express advocacy seemed neat in theory, the

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 26

two categories of advertisements proved *functionally identical* in important respects." (emphasis added)); *id.* at 206 (finding that the "vast majority" of issue ads had an "electioneering purpose" and hence were the functional equivalent of express advocacy), the Chief Justice read the term far more narrowly. Expressing the same overbreadth concerns that had troubled the Court in *Buckley*, he held that "an ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *WRTL*, 127 S. Ct. at 2667. He found that the interests that justified the regulation of campaign speech did not, in that case, justify the regulation of all genuine issue advertising. *Id.* at 2673.

Although *WRTL* suggests a renewed concern for the chilling effect of campaign finance laws on the discussion of public issues, the breadth of its holding remains unclear. *McConnell* limited the definition of "electioneering communication" to the "functional equivalent of express advocacy" only as far as it applied to the *prohibition* on corporate and union speech, 540 U.S. at 206, and apparently not as it applied to the BCRA's *disclosure* requirements, *see id.* at 201 (stating, without reservation, that the BCRA's "disclosure requirements are constitutional"). Because *WRTL*'s as-applied challenge was limited to the BCRA's corporate speech prohibition, it is unclear whether the opinion's logic extends to lesser burdens on non-express advocacy.

More importantly, nothing in *Buckley*, *McConnell*, or *WRTL* suggests that "issue advocacy" is *fundamentally* entitled to greater First Amendment protection than express political advocacy. Indeed, in *Buckley*, the Court repeatedly emphasized that that the protection of campaign speech was at the core of the First Amendment and it merited the same protection as any speech regarding issues of public concern. 424 U.S. at 15 ("[I]t can hardly be doubted that the [First Amendment] guarantee has its fullest and most urgent application precisely to the conduct of campaigns for public office." (internal quotation omitted)); *id.* at 48 ("Advocacy of the election or defeat of candidates . . . is no less entitled to protection under the First

Amendment than the discussion of political policy . . . ."). The Supreme Court has protected "issue advocacy" from the federal campaign finance laws not because that speech is sacred, but simply because the rationales proffered for those laws have not justified imposing broad burdens on public discourse. *See WRTL*, 127 S. Ct. at 2673 (finding the BCRA's prohibition on corporate speech unconstitutional as applied because "appellants identify no interest sufficiently compelling to justify burdening WRTL's speech").

*Buckley*, *McConnell*, and *WRTL* each dealt with federal campaign finance laws that were limited to the election of *candidates*, but *ballot initiative* elections present strikingly different considerations. Indeed, the entire concept of "issue advocacy" takes on a different meaning in ballot measure elections. In candidate elections, "campaign speech" and "issue advocacy" are often difficult to distinguish in practice, but they are at least distinct in theory. *McConnell*, 540 U.S. at 126. In that context, campaign speech is intended to influence the listener to vote for or against a candidate, whereas issue advocacy is intended simply to influence the voter's opinion on an issue of public concern. The problem, of course, is that the speaker's "intent" is impossible to determine, so pure issue advocacy on any number of issues might be mistaken for campaign speech. *Buckley*, 424 U.S. at 42. Any speaker stating a position on an issue that happens to coincide with a candidate's position could be deemed to be "supporting" the candidate; similarly, any disagreement with a candidate's position could be misinterpreted as "opposition" to the candidate. Therefore, broad regulation of campaign speech in a candidate election could potentially chill vast amounts of issue advocacy on a wide range of public issues—indeed, *any* issue on which *any* candidate has taken a position.

In the ballot initiative context, however, there is little, if any, meaningful distinction between issue and express advocacy. Ballot initiatives present a single *issue* for public referendum. *See First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 790 (1978) ("Referenda are held on *issues* . . . ." (emphasis added)). "Campaign speech," in this context, is speech intended to influence the voter's opinion as to the merits of this single issue—in other words, it

is "issue advocacy," plain and simple. When an issue is presented to the public for referendum in this manner, the legitimate state interest in determining and reporting "where [the] money comes from," *Buckley*, 424 U.S. at 66 (internal quotation omitted), extends to all public debate on that issue. For example, I-1000 asks voters to decide *a single, specific issue*—namely, whether Washington should allow physician-assisted suicide. In the lead up to the election, voters are entitled to know who is lobbying to influence their opinion on that issue, and whether the speaker has a vested interest in the outcome of ballot initiative.[4] Similarly, when HLW telephones pro-life households with "an urgent update" informing them of I-1000 and "pleading for [their] help" "at this critical time to get the truth out" about physician-assisted suicide, contributors have an interest in ensuring that HLW actually spends the donated funds on the intended advocacy, whether that advocacy "expressly" mentions I-1000 or not. In short, from the perspective of the state's compelling interests, there is simply no difference between speech that advocates for or against physician-assisted suicide and speech that advocates for or against I-1000.

Regulation of ballot initiative campaign speech, defined broadly, will therefore necessarily impose a burden on "issue advocacy"; however, it is a much more targeted and limited burden than that which troubled the Court in *Buckley* and *WRTL*. Broad, ambiguous regulation of campaign speech in a candidate election risks burdening issue advocacy that is only peripherally related to the election. Moreover, it threatens to burden debate on a *broad*

---

[4] Ballot initiatives also often concern proposed public works projects, where some private parties are almost certain to have a financial stake in the outcome. For example, consider any of the several ballot initiatives concerning the construction of a citywide monorail in Seattle—several parties (construction firms, owners of homes on the proposed line, etc.) have a financial interest in the outcome of such an election. The voters' compelling interest in "knowing who is lobbying for their vote," *CPLC I*, 328 F.3d at 1106, clearly justifies regulating an organization that publicly advocates passing the initiative, but it likewise justifies regulating an organization advocating for the "general" idea that Seattle should have a citywide monorail. The latter issue is fundamental to the ultimate question being put before the voters and implicates the same governmental interest in tracking and disclosing the sources of public expenditures.

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 29

range of issues—indeed, any issue that is arguably "pertinent" to the election. *See WRTL*, 127 S. Ct. at 2669. In contrast, regulating campaign speech in a ballot measure election will burden issue advocacy only as to the *single* issue put before the public, and only because such campaign speech and issue advocacy are, both in practice and in theory, one and the same. In that scenario, the disclosure of issue advocacy is not an unfortunate byproduct of the campaign disclosure laws; it is its central and intended purpose.

Accordingly, the Court rejects HLW's contention that there is a bright-line rule prohibiting the regulation of "issue advocacy" and holds that the state's compelling interests in informing the electorate and protecting contributors justify requiring "political committees" to report on and disclose all expenditures made "in support of, or opposition to . . . a ballot proposition." This holds even when "expenditure" is defined to include some advocacy as to the "issue" underlying the proposition, as long as such regulations are limited to the specific issue on which the public's vote is being sought.

### (d)    "one of its primary purposes"

HLW also argues that the state's definition of "political committee" is overbroad because the "maker of expenditures" prong applies to any organization that has as "its 'primary *or one of the primary purposes* to affect, directly or indirectly, governmental decision making by supporting or opposing candidates or ballot propositions.'" *EFF*, 49 P.3d at 903 (emphasis added) (*quoting State v. Dan Evans Campaign Comm.*, 509 P.2d 75, 79 (Wash. 1976)). HLW claims that the State can only impose "PAC-style" reporting and disclosure requirements on organizations whose *single* "major purpose" is the election or defeat of candidates or ballot initiatives.

In *Buckley*, the Supreme Court considered the FECA's disclosure requirements as they applied to both "political committees" (who had to "register with the [FEC] and to keep detailed records of both contributions and expenditures") and individuals (who had to disclose contributions or expenditures of over $100 per year, excluding contributions to a candidate or

political committee). 424 U.S. at 63–64. The Court raised the same overbreadth concerns that had led it to strike down the FECA's expenditure ceilings, noting that the requirements for "political committees" "could raise similar vagueness problems" because the term "could be interpreted to reach groups engaged purely in issue advocacy." *Id.* at 79. However, the Court noted that several lower courts had construed the FECA "to apply only to committees soliciting contributions or making expenditures the major purpose of which is the nomination or election of candidates." *United States v. Nat'l Comm. for Impeachment*, 469 F.2d 1135, 1141 (2d Cir. 1972). The Supreme Court adopted this narrowing construction, noting that "[t]o fulfill the purposes of the Act they need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate." *Buckley*, 424 U.S. at 79. The Court found that the definition, so narrowed, no longer raised overbreadth concerns; however, it never suggested that this was the *only* legitimate narrowing construction that it could have adopted.

Subsequent Supreme Court opinions make clear that there is no "bright line" requirement that PAC-style requirements only be imposed on organizations whose single "major purpose" is campaign advocacy. One line of cases involved a provision in the FECA that prohibited *any* corporation "from using treasury funds to make an expenditure 'in connection with' any federal election . . . ." *MCFL*, 479 U.S. at 241. To make political expenditures under the statute, a corporation needed to "administer[] a segregated political fund," "appoint a treasurer for its segregated fund, keep records for all contributions, file a statement of organization containing information about the fund, and update that statement periodically," *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 657 (1990)—in other words, the FECA essentially imposed "PAC-style" requirements on *all* corporations, regardless of their major purposes. In *MCFL*, the Supreme Court considered an as-applied challenge to this provision by a small, nonprofit, ideological corporation, 479 U.S. at 241–42, and noted that the corporation faced "more extensive requirements and more stringent restrictions than it

would be if it were not incorporated." *Id.* at 254. The Court suggested that there generally were compelling state interests in regulating the campaign speech of corporations, who received artificial, state-created advantages and whose ability to amass large sums of wealth might lead to an unfair advantage in the political marketplace. *Id.* at 257. However, the Court found that those interests did not apply in this narrow case because MCFL (1) "was formed for the express purpose of promoting political ideas and cannot engage in business activities," (2) "ha[d] no shareholders or other persons affiliated so as to have a claim on its assets or earnings," and (3) "was not established by a business corporation or a labor union, and . . . [had a] policy not to accept contributions from such entities." *Id.* at 264 (noting that these "three features [are] essential to our holding"). Later, in *Austin*, the Court reiterated that the *MCFL* exception was narrow and applied only to corporations that "share[] these crucial features." 494 U.S. at 662. *Austin* makes perfectly clear that PAC-style requirements (extremely similar to those at issue in this case) may be imposed on non-*MCFL*-like corporations who partake in campaign activity even if it is not their single "major purpose." *See id.*[5]

The Ninth Circuit has upheld the imposition of PAC-style requirements without regard to a corporation's "major purpose," even when that corporation fits within *MCFL*'s narrow exception. In *ARTLC*, the Court considered an Alaska campaign law that required *MCFL*-type corporations to register and file regular reports with the state's election commission. 441 F.3d at 789–91. The Court upheld these PAC-style requirements, noting that they were "not particularly onerous" and justified by the standard interests in disclosure that the Supreme Court recognized in *Buckley* and *McConnell*. *Id.* at 791–92.[6]

---

[5] HLW does not claim to fit within the exception set forth in *MCFL*. HLW appears to satisfy the first two elements of the test (*see* Compl. ¶ 13 (Dkt. No. 1) ("HLW is a nonstock, ideological . . . corporation . . . .")); however, the record does not indicate whether HLW "accepts contributions from" "business corporation[s] or labor union[s]," *see MCFL*, 479 U.S. at 264.

[6] HLW suggests that *ARTLC* was incorrectly decided. (*See* Mot. 9 (Dkt. No. 67) (arguing that *ARTLC* "ignores *MCFL*'s lengthy discussion of the organizational and conduct

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 32

HLW claims, somewhat disingenuously, that the Ninth Circuit held in *CPLC II* that "PAC status may not be imposed on 'multi-purpose organizations.'" (Mot. 7 (Dkt. No. 67).) In fact, the Court in that case explicitly *rejected* CPLC's argument that "because its major purpose is not campaign advocacy, it was improper for California to 'treat [CPLC] like a PAC.'" 507 F.3d at 1180 n.11. The Court cited *ARTLC* for the proposition that "*irrespective of the major purpose of an organization*, disclosure requirements may be imposed" and found "CPLC's argument to the contrary . . . unpersuasive." *Id.* (emphasis added).

HLW's only support comes from a nonbinding case from the Fourth Circuit. *N.C. Right to Life, Inc. v. Leake (NCRTL)*, 525 F.3d 274 (4th Cir. 2008). That case involved North Carolina's campaign finance law, which defined a "political committee" to cover any organization that has "*a* major purpose to support or oppose" a candidate for election. *Id.* at 286 (emphasis added). The majority held that *Buckley* had created a hard-and-fast rule: "an entity must have '*the* major purpose' of supporting or opposing a candidate to be designated a political committee." *Id.* at 288 (emphasis in original). It found the state statute overbroad, because it would regulate too much "protected speech unrelated to elections." *Id.* at 289. The majority also found the statute unconstitutionally vague, because it did not expressly define when a "purpose" became a "major purpose." *Id.* at 290.

This Court respectfully disagrees with the Fourth Circuit's analysis. Nothing in *Buckley* or *MCFL* suggests a bright-line requirement that PAC-style requirements be reserved for organizations whose single "major purpose" is election-related; indeed, *Austin* specifically upheld similar requirements on a multi-purpose corporation. 494 U.S. at 662. The phrase "*a* major purpose" is no more vague than "*the* major purpose." *See NCRTL*, 525 F.3d at 328 (Michael, J., dissenting). Moreover, the Washington statute in this case creates only civil penalties, and parties can request prior interpretations from the PDC (Rippie Decl. ¶ 21–22

---

burdens of PAC status").) The Court disagrees, but notes that it would, of course, be bound to follow *ARTLC* even if it disagreed with the Ninth Circuit's analysis.

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 33

1   (Dkt. No. 47 at 11–12)), so there is little fear that any remaining ambiguity in the test will chill

2   protected speech.

3          Finally, there are compelling state justifications for extending PAC-style reporting to

4   multi-purpose organizations. First, *Buckley*'s "*the* major purpose" test "encourages advocacy

5   groups to circumvent the law by *not* creating political action committees and instead to hide

6   their electoral advocacy from view by pulling it into the fold of their larger organizational

7   structure." *NCRTL*, 525 F.3d at 332 (Michael, J., dissenting) (emphasis in original). Second,

8   basing "political committee" status on an organization's single "major purpose" discriminates

9   against small organizations, because advocacy that would constitute a small organization's

10  major purpose might only be considered one of several primary purposes at a larger entity. By

11  considering the *absolute* amount of campaign activity as opposed to the *relative* amount of

12  such activity, the state can fairly treat like political expenditures alike, regardless of their

13  source.

14         Therefore, the Court holds that Washington's definition of "political committee" is not

15  rendered overbroad simply by including organizations that make supporting or opposing an

16  election "one of [their] primary purposes." The state has a compelling interest in regulating all

17  such organizations rather than simply those whose *single* major purpose is campaign activity.

18  There are advantages and disadvantages to both approaches, and neither is constitutionally

19  required.

20                      **(e)      "actual or constructive knowledge"**

21         HLW also challenges the "political committee" definition based on its "receiver of

22  contributions" prong, which it likewise claims is overbroad. (Mot. 18 (Dkt. No. 67).) In

23  *Buckley*, the Supreme Court interpreted the FECA's definition of "contribution" to only

24  include funds that were "earmarked for political purposes." 424 U.S. at 23 n.24. HLW argues

25  that this limiting construction is constitutionally required, and that Washington's definition is

26

overbroad because it applies whenever a contributor *knows or reasonably should know* that the funds will be used for political purposes. *EFF*, 49 P.3d at 905.

Nothing suggests that states may only regulate contributions that are expressly made for political purposes. In *Buckley*, the Supreme Court considered regulations that applied to various transfers of funds made "for the purpose of influencing" a federal election or primary. 424 U.S. at 23. The statute did not define this phrase, so the Court relied on its "general understanding of what constitutes a political contribution," which included all funds provided directly or indirectly to a candidate, political party, or campaign committee, and all funds transferred to another person or organization "earmarked for political purposes." *Id.* at 23 n.24. Viewed in this light, the Court held that the FECA's definition of "contribution" was not unconstitutionally vague, *see id.* at 23 n.24, 78; however, it never suggested that states could *only* regulate "earmarked" political contributions.

In fact, the Ninth Circuit has already rejected HLW's argument. In *CPLC II*, the Court considered California's definition of "contribution," which included any payment made when "the donor *knows or has reason to know* that" the payment will be used to make other political contributions or expenditures. 507 F.3d at 1181 (emphasis in original). CPLC argued that the state could only regulate contributions "expressly made for political purposes," but the Court disagreed. *Id.* at 1183 (internal quotation omitted). The state explained why *Buckley*'s narrow definition was insufficient to further its compelling informational interests: "By simply discouraging donors from earmarking their donations . . . , any multi-purpose group could escape classification as a [political committee] and thereby avoid the duty to disclose its contributors . . . ." *Id.* at 1183 (internal quotation omitted). The Court held that California's definition of contribution was narrowly tailored to support its compelling government interest. *Id.* at 1184.

Likewise, Washington's "receiver of contributions" test does not render its PAC-style requirements overbroad. The state's compelling interest in informing the electorate about the

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 35

source of political advocacy easily extends to contributions made with the *knowledge* that the contributed funds will be used for political ends. Moreover, a contributor is only deemed to have "constructive knowledge" of an organization's political intentions if that organization has taken some explicit action to make those intentions clear, such as (1) soliciting contributions for political advocacy, (2) segregating funds for political purposes, (3) registering as a "political committee" with the PDC, or (4) indicating in the organization's bylaws that it intends to receive political contributions. (Rippie Decl. ¶ 35 (Dkt. No. 47 at 18).) As a result, Washington's treatment of "contributions" is far less vague than that in the FECA, which turned on the hard-to-discern "purpose" of the contribution. *See Buckley*, 424 U.S. at 23 n.24. Therefore, by limiting its regulations to contributions made with "actual or constructive knowledge that the organization is setting aside funds to support or oppose a candidate or ballot proposition," *EFF*, 49 P.3d at 904, the state has narrowly tailored its PAC-style requirements while avoiding the ambiguities that the Court was concerned with in *Buckley*. *See CPLC II*, 507 F.3d at 1183 ("The fact that California has more explicitly defined 'contribution' does not weaken its legislation.").

### (f)    "expectation"

Finally, HLW notes that Washington defines "political committees" based on an "expectation" of receiving contributions or making expenditures, and it argues that the term "expectation" is unconstitutionally vague. (Mot. 17 (Dkt. No. 67) ("Is it a hope?—promise?—understanding?—agreement?—contract?").) The Court agrees that the term is ambiguous and that, without guidance from the state courts, it might be difficult for a person of normal intelligence to know at what point an organization "expected" to receive contributions or make expenditures. However, as has already been made clear, the state courts and agencies have significantly narrowed each of the definition's prongs and, in the process, have stripped the definition of ambiguity.

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 36

As described above, to qualify as a "receiver of contributions," an organization must have taken an affirmative step to give potential contributors "actual or constructive knowledge that the organization is setting aside funds to support or oppose a candidate or ballot proposition." *EFF*, 49 P.3d at 904. After any of the specific triggering actions takes place, the organization can "expect" to receive political contributions because its potential contributors will "know or should know" that their contributions will be used for political activity. (Rippie Decl. ¶ 35 (Dkt. No. 47 at 18–19).)

The definition of "political committee" has been similarly narrowed under the "maker of expenditures" prong by requiring that the organization "have as its primary or one of the primary purposes" to support or oppose ballot propositions. *EFF*, 49 P.3d at 903 (internal quotation omitted). Once the organization has made electoral political activity "one of its primary purposes," there is no doubt that it will "expect" to make expenditures in support of that purpose.

These narrowing interpretations of the definition's two prongs impose "political committee" status only after concrete, discernible criteria have been met. In so narrowing the definition, the state courts and agencies have eliminated any ambiguity initially presented by the term "expectation."

### (g) Narrow Tailoring

In sum, the Court finds that Washington's PAC-style disclosure and reporting requirements are narrowly tailored to serve the state's compelling interests. Washington's "political committee" requirements are "not particularly onerous." *ARTLC*, 441 F.3d at 791. When Washington voters are asked to vote on an issue of public concern, they are entitled to know who is lobbying to influence their opinion on that issue. Similarly, when Washington residents contribute funds to an organization claiming to support or oppose a ballot initiative, those contributors are entitled to verify that their funds were used for their intended purpose. *See Riley*, 487 U.S. at 800 (explaining that compelling disclosure of contributions and

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 37

expenditures is one of the "more benign and narrowly tailored" means to ensure that organizations are appropriately using the public's contributions). The State is justified in extending these disclosure and reporting requirements to organizations that make campaign advocacy "their primary or one of their primary purposes" and to organizations that give their contributors "actual or constructive knowledge" that the donated funds will be used for electoral political activity. Finally, by reserving its reporting requirements for the most active political committees (*see* Rippie Decl. ¶ 26 (Dkt. No. 47 at 14)), the state has narrowly tailored the provisions to avoids unduly chilling the speech of smaller or more reticent political advocates.

Democracy depends on "uninhibited, robust, and wide-open" speech, which cannot occur "when organizations hide themselves from the scrutiny of the voting public." *McConnell*, 540 U.S. at 197 (internal quotation omitted). The requirements that Washington imposes on "political committees" enforce the disclosure necessary to maintain a well-functioning political process, and no more. Therefore, the PAC-style requirements survive strict scrutiny.

### 2. Disclosure Requirements for "Independent Expenditures"

Any entity, regardless of whether it qualifies as a "political committee" under Washington law, must disclose its "independent expenditures" to the PDC if the value of such expenditures totals more than one hundred dollars or cannot reasonably be estimated. WASH. REV. CODE § 42.17.100(2)–(4). An "independent expenditure" is defined as "any expenditure that is made in support of or in opposition to any candidate or ballot proposition" and is not already required to be disclosed under the rules governing political committees. *Id.* § 42.17.100(1). HLW challenges these disclosure requirements for the same reasons it challenges the PAC-style reporting requirements: it argues that "support" and "opposition" are unconstitutionally vague and that the definition as a whole is overbroad because it is not limited to "express advocacy" as applied in *Buckley*. (Mot. 19–21 (Dkt. No. 67).)

The Court has already rejected both of these arguments. Moreover, HLW's challenge is particularly unpersuasive when directed at simple disclosure requirements, which are reviewed under "exacting scrutiny." *See Davis v. FEC*, 128 S. Ct. 2759, 2775 (2008); *Buckley*, 424 U.S. at 64. The Court finds it evident that requiring disclosure of independent expenditures is "substantially related" to Washington's compelling interests; indeed, simple disclosure is one of the least restrictive means of furthering the state's interests. *See McConnell*, 540 U.S. at 201 (noting that disclosure requirements "do not prevent anyone from speaking" (internal quotation omitted)).

### 3.   Disclosure Requirements for "Political Advertising"

Washington also imposes special requirements on "political advertising," and HLW argues that the state's definition of this term is vague and overbroad. (*See* Mot. 21–22 (Dkt. No. 67).) "Political advertising" is defined to include "any advertising displays, newspaper ads, billboards, signs, brochures, articles, tabloids, flyers, letters, radio or television presentations, or other means of mass communication, used for the purpose of appealing, directly or indirectly, for votes or for financial or other support or opposition in any election campaign." WASH. REV. CODE § 42.17.020(38).

First, HLW again claims that the terms "support" and "opposition" are vague and overbroad because they could chill "issue advocacy." (Mot. 21–22 (Dkt. No. 67).) This argument is no more persuasive when applied to the definition of "political advertising" than when applied to the definitions of "political committee" or "independent expenditure."

Second, HLW argues that the phrase "directly or indirectly" is vague and overbroad. (*Id.* at 21.) In *ARTLC*, however, the Ninth Circuit had "little trouble" upholding a statute that contained this same term. 441 F.3d at 782–83. In that case, the Court considered Alaska's definition of "electioneering communication," which resembled the federal definition except that it applied when a communication "directly or indirectly identifies a candidate" whereas the federal definition required that a candidate be "clearly" identified. *Id.* The Court explained:

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 39

The federal definition specifies no method of identification. The Alaska definition specifies that the method may be direct or indirect; however, since the words "direct and indirect" together describe the complete universe of possible methods of identification, the Alaska statute has the actual effect of requiring no specific methods of identification, just like the federal definition.

*Id.* at 783. As in *ARTLC*, the phrase "direct and indirect" neither expands nor contracts the scope of Washington's definition of "political advertising"—instead, it simply "describe[s] the complete universe of possible" appeals. *Id.* Because the phrase does not change the definition's meaning, it cannot, by itself, render the definition vague or overbroad.

Finally, HLW notes, and the state concedes, that the statute does not define the term "mass communication." (Mot. 22 (Dkt. No. 67); Rippie Decl. ¶ 46 (Dkt. No. 47).) The Court acknowledges that the term contains some ambiguity, but this ambiguity provides insufficient grounds to find the definition of "political advertising" unconstitutional. HLW proposes to solicit fundraising through letters and telephone calls and to issue "radio ads." (Compl. ¶ 22–24 (Dkt. No. 1).) The "political advertising" definition explicitly covers "letters" and "radio and television presentations," so the only relevant question to HLW's as-applied challenge is whether its proposed telemarketing solicitation would be considered "any . . . other means of mass communication." WASH. REV. CODE § 42.17.020(38). The Court finds that telemarketing fits squarely within any reasonable definition of "mass communication," especially now that telephones are increasingly used both for fundraising and direct political advertising. *See, e.g.*, Carol Costello, *Robocalls flood phone lines in battleground states*, CNN, Oct. 23, 2008, *available at* http://www.cnn.com/2008/POLITICS/10/23/robo.calls/. Moreover, HLW cannot bring a facial challenge on overbreadth grounds unless it demonstrates that the ambiguity in the definition will chill "substantial" amounts of protected speech. *See Virginia v. Hicks*, 539 U.S. 113, 119–20 (2003). HLW makes no attempt to prove that *any* speakers would self-censor their protected speech out of fear that their method of communication might impermissibly be deemed an "other means of mass communication," much less than such a chilling effect would be "substantial . . . relative to the scope of the law's plainly legitimate applications." *Id.*

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 40

1  Accordingly, the Court finds that HLW has failed to carry its "heavy burden" of proving that

2  the potentially ambiguous "mass communication" term renders the definition of "political

3  advertising" overbroad. *See McConnell*, 540 U.S. at 207.

### 4.  "Ratings, Evaluations, Endorsements and Recommendations"

5  Finally, HLW challenges the treatment of ratings and endorsements under Washington

6  Administrative Code § 390-16-206, which provides:

> (1) Any person making a measurable expenditure of funds to communicate a rating, evaluation, endorsement or recommendation for or against a candidate or ballot proposition shall report such expenditure including all costs of preparation and distribution in accordance with [Washington Revised Code] chapter 42.17. However, rating, endorsement or recommendation expenditures governed by the following provisions are not reportable: The news media exemptions provided in [Washington Revised Code §] 42.17.020(15)(b)(iv) and (21)(c), and [Washington Administrative Code §] 390-16-313(2)(b), and the political advertising exemption in [Washington Administrative Code §] 390-05-290.
>
> (2) A candidate or sponsor of a ballot proposition who, or a political committee which, is the subject of the rating, evaluation, endorsement or recommendation shall not be required to report such expenditure as a contribution unless the candidate, sponsor, committee or an agent thereof advises, counsels or otherwise encourages the person to make the expenditure.

16  *Id.* The record makes clear that this provision was not intended to create new reporting

17  requirements, but rather to clarify that certain "ratings, evaluations, endorsements, and

18  recommendations" would *not* need to be disclosed to the PDC or reported as contributions by

19  candidates or initiatives being endorsed. (*See* Rippie Decl. ¶ 50 (Dkt. No. 47 at 26).) In

20  particular, ratings and endorsements made without "a measurable expenditure of funds" or

21  made in the form of a news media item, commentary, editorial, etc., need not be disclosed as

22  expenditures or reported as contributions. (*Id.*)

23  HLW argues that § 390-16-206 is unconstitutional because it "relies on a vague

24  for/against test" and "regulat[es] a vast swath of protected issue advocacy." (Mot. 22–23 (Dkt.

25  No. 67).) Again, the Court notes that "issue advocacy" is not entitled to absolute protection

26  under the First Amendment and can be regulated if the circumstances so justify. Moreover, the

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
PAGE - 41

provision at issue in this challenge does not create new reporting requirements; instead, it carves out an exception to the existing disclosure requirements in order to preserve the traditional function of the news media and to allow non-journalistic individuals and organizations "to evaluate and rank candidates and ballot measures without reporting so long as they are not paying for advertisements or otherwise spending funds to communicate" the ranking or evaluation. (Rippie Decl. ¶ 50 (Dkt. No. 47).) In carving out this commendable exception, the state employs language no more vague than the "support" and "oppose" language approved by the Supreme Court in *McConnell*. 540 U.S. at 170 n.64. In sum, the Court holds that § 390-16-206 does not violate the First Amendment; instead, it is a laudable attempt to *protect* traditional First Amendment interests within Washington State's campaign finance framework.

## III.  CONCLUSION

For the foregoing reasons, Plaintiff's Motion for a Summary Judgment (Dkt. No. 67) is DENIED.

SO ORDERED this 8th day of January, 2009.

John C. Coughenour
United States District Judge